# Speed's Executor *vs* Nelson's Executor; Brooks' Executor *vs* Same.

## ERROR TO THE GENERAL COURT.

*Executors. Equitable assets. Jurisdiction. Agents.*

JUDGE SIMPSON delivered the opinion of the Court.

MANY years since, Sampson Matthews, of Virginia, transferred to one Alexander Nelson, who had married his daughter, two notes on George Wilson, who resided in Kentucky, On these notes suits were instituted, and judgments recovered. Wilson enjoined the judgments, and in the year 1817, his injunction was dissolved, and his bill in chancery filed, for the purpose of procuring the injunction, was dismissed.

Joseph Brooks having entered as the surety of Wilson in the injunction bond executed by him, and hav-

CHANCERY.

Case 126.

July 18.

Case stated.

ing died shortly after the dissolution of the injunction, Alexander Nelson brought suit on the bond against Solomon Neil, who was the executor of Joseph Brooks, and in November, 1824, recovered judgment against him, as executor, for the sum of $3,333 33, besides costs.

Various executions issued on said judgment, to be levied of the assets in the hands of the defendant, as executor of Joseph Brooks, dec'd., and were returned "*nulla bona.*" The last of these executions bears date in October, 1830.

Alexander Nelson, who, from the probate of his will, appears to have died before the year 1834, appointed his son, James Nelson, his executor, who, in the year 1839, instituted this suit in chancery in the General Court, against Solomon Neil, the executor of Joseph Brooks, dec'd. and his sureties in his executorial bond, and also against other persons, as heirs and devisees of said Joseph Brooks. The executor is alledged to have committed a *devastavit*, a discovery of assets is sought for, and the executor and his sureties are prayed to be made liable for the whole amount of the judgment at law.

Joseph Brooks was the owner of a large estate, consisting in lands, slaves and personalty. By his last will and testament, he bequeathed to his wife all his personal property, together with a number of slaves. He devised land and slaves to his children; and having appointed Solomon Neil, Elisha Standeford, and his son, Joseph A. Brooks his executors, devised to them the whole residue of his lands for the payment of his debts. Neil alone, of those nominated, qualified as executor.

Probate of the will of Joseph Brooks, was made in the Jefferson County Court, and Neil settled his accounts as executor, with that Court in 1822 and in 1826, and again in 1829.

In the settlement made by the County Court, no discrimination is made between the legal assets in his hands and those arising from the sales of the real estate, which he made as executor under the will.

It appears, however, from the report of the commissioner who was appointed by the Court below to adjust

Where an executor paid over to

the accounts, that the legal assets embraced by the settlements, amount to $9,561 07, and those arising from the sales of real estate made by the executor, to $5,634 39. One item included in the legal assets is objected to. The widow paid to the executor the sum of one thousand dollars, to be applied to the payment of the testator's debts. This sum, it is contended, should be regarded as equitable assets. We think, however, the circumstances justify a different conclusion. The personal estate bequeathed to the widow was legal assets in the hands of the executor. It was his duty to retain it until the debts were all paid. Not having done so, and the widow having, when it was believed necessary to enable the executor to pay off the debts, advanced to him this sum for that purpose, the presumption arises, in the absence of all other testimony explanatory of the transaction, that it was done because she was under a legal obligation to refund the amount if necessary for the payment of debts, in consequence of having received from the executor the personal estate, for which he was responsible as legal assets.

the widow, out of the personal estate before the debts were paid, and the widow paid to him a part thereof to pay debts, it is proper to consider such sum as legal not equitable assets.

After allowing to the executor all the credits to which he is entitled, there still remains in his hands of the assets with which he stands charged in the County Court settlements, the sum of $550 57½, although according to those settlements, as they appear on their face, the estate was indebted to him in a considerable sum. A different result is, however, produced by a correction of those settlements, in the particular items designated by the complainant in the pleadings, as improper and unauthorized, and manifested to be so by the facts and evidence in the cause; and the executor, when such correction is made, is ascertained to have in his hands the above named sum.

But in addition to this correction of the County Court settlements, the complainant contends the executor is further liable for a large balance due on his own note to his testator, at the time of his death, and also for the purchase money of a tract of land sold by him to one John W. Beckwith.

SPEED'S EX'R.
*vs*
NELSON'S EX'R.
&C.

The facts in relation to the executor's note are as follows: His testator in his will, devised to him a tract of land, which he had previously conveyed to him by deed, reciting a consideration of four thousand dollars. The complainant, in an amended bill, alledged that the consideration in the deed was fictitious and had never been paid; that the executor having intermarried with the daughter of the testator, the land was conveyed to him as a gift, and was, therefore, liable for the payment of the testator's debts. In answer to this allegation the executor exhibited a note executed by him to his testator, dated in November, 1816, for $4,555 50 cents, payable two years after date, reciting on its face that it was in consideration of a tract of land and a negro girl purchased by the obligor from the payee. He denied the alledged gift, contended he had purchased the land for a full and fair consideration, had executed the foregoing note for the price, and had paid it, in the lifetime of his testator.

When an executor had executed a note to his testator in his lifetime, who died before the maturity of the note, the possession of the note by the executor thereafter, should not be taken as evidence of the payment thereof, and the executor should be held to account therefor.

His testator died before the maturity of the note, but there are two credits endorsed on the note by Brooks, in his lifetime, amounting together, to twenty five hundred dollars and upwards. The executor has adduced no evidence of payment, but relies on the presumption arising from the fact that he has the note in his possession. This presumption, however, we think, is repelled by the circumstance, that being executor, he had a right to the possession of all the testator's papers, and may have acquired the possession of the note as executor, after the death of his testator. The probability of its payment is, in a great measure destroyed by the fact, that the debt was not due when Brooks died. No circumstances are proved which would create a reasonable presumption of payment. There was no money on hand at the time Brooks died. It is not shown that he had, any short time before his death, used any money for any purpose. If the note had been paid, it would, in all probability, have been known by some of the family, and evidence of the fact could have been procured by the executor. The circumstance that the testator, in his will, makes no allusion to the debt, has been

relied upon, as tending to prove its previous payment. So far, however, as any inference is fairly deducible from the will on this subject, it is, that the land was given to Neil, and the balance on the note was neither collected nor intended to be, at any future time. But inasmuch as the executor has assumed the ground that it was not a gift, but a purchase, it was incumbent upon him to have manifested, by proof, the payment of the purchase money, which, in our opinion, he has wholly failed to do; and therefore, is chargeable as executor, with the balance of the debt and interest, as so much money due to his testator.

The executor sold and conveyed a tract of land which had belonged to his testator, to John W. Beckwith, James Pryor and Frederick W. S. Grayson, at the price of $2,836, shortly after the death of Brooks. He has not accounted for this purchase money, nor is he charged in the settlements made with the County Court, with any thing accruing from the sale of this tract of land. He states that Beckwith afterwards failed, and not having paid for the land, he rescinded the contract with him, took the land back, and afterwards sold it to others at a much less price. This statement, however, is contradicted by all the facts and circumstances in the case. The deed which he executed, acknowledges the receipt of the purchase money. Nearly ten years after he had sold and conveyed this tract of land, it was reconveyed to him, not in consequence of a rescission of the contract as alledged, but to indemnify him as the surety of Beckwith on a note in Bank, for upwards of twenty five hundred dollars; Beckwith having, in the mean time, purchased out the interest of Grayson and Pryor in the lands. Besides, the executor does not pretend that the other vendees became insolvent, nor does he take any testimony to support his statement as it regards the supposed rescission. It is, therefore, perfectly apparent that he is chargeable as executor, with the money arising from this sale.

The executor's sureties, however, contend they are not liable for the money arising from the sale of the real estate, it constituting equitable and not real assets.

An executor sold and conveyed land of the testator, he is chargeable with the amount acknowledged by his deed to have been received.

SPEED'S EX'R.
vs
NELSON'S EX'R.
&c.
—————
—But money,
the produce of
land sold in pur-
suance of a de-
vise or power
conferred by will
is equitable, not
legal assets, and
subject to the
disposition of the
Chancellor.

It was decided by this Court in the case of *Loftus* vs *Locker*, (1 *J. J. Marshall*, 298,) that the money arising from the sale of real estate, devised to be sold by the executor for the payment of the debts of the testator, was legal assets in the executor's hands; although the land itself, before the sale, was only equitable assets. But in the subsequent cases of *Helm, &c.* vs *Darby's administrator*, (3 *Dana*, 186;) *Cloudas' executrix* vs *Adams*, (4 *Dana*, 603;) and *Clay and Craig* vs *Hart*, (7 *Dana*, 1,) a different view of the law was taken; and it may now be regarded as the settled doctrine, that money arising from the sale of real estate by an executor, in pursuance of a devise or power conferred on him for that purpose, is equitable assets, constituting a trust fund, and subject to the equitable control of the Chancellor.

Whether the
sureties of an
executor are li-
able for his mal-
administration of
equitable assets
which came to
his hands, de-
pends upon the
condition of his
executorial bond
—They are not
according to the
form of the bond
prescribed by the
statute of 1797,
except so far as
the executor fails
to appropriate
such funds to the
payment of lega-
cies: *Moore and
others* vs *Wal-
ler's hrs.* (1 *Mar-
shall,* 491.)

Are the sureties of the executor responsible for equitable assets in his hands? This depends upon the stipulation contained in the bond given by the executor and executed by them as his sureties, and the obligation it imposes upon them. The bond was executed in 1818, and is substantially in the form prescribed by the statute of 1797. The condition of the bond, so far as it is material to this question is: First, "That the executor do make a true and perfect inventory of all and singular, the goods, chattels and credits of the said deceased." Secondly. "And the same *goods, chattels* and *credits* do well and truly administer according to law;" and, Thirdly. "Do well and truly pay and deliver all the legacies contained and specified in the said will, as far as the said goods and chattels will extend, according to the value thereof, and as the law will charge him."

The undertaking by the sureties is, that the executor shall administer the *goods, chattels* and *credits* of the deceased according to law. The stipulation does not extend to lands, and the language used cannot, according to any just interpretation, be made to include them or money arising from the sale of them by the executor, in the administration of the estate, as provided for by the bond. The stipulation in reference to the payment of legacies is more comprehensive. They are to be

paid by the executor, not only *as far* as the goods, chattels and credits will extend, but also *as far* as the law charge him. And inasmuch as the law would charge him, with money arising from the sale of land, charged with the payment of legacies, and received by him, his sureties would be responsible for it.

Thus, in the case of *Moore et al.* vs. *Waller's heirs*, (1 *Marshall*, 491,) it was decided, that according to the just import of the bond, the sureties are liable for all *legacies* for which the executor is by law chargeable, whether they relate to personal estate, or grow out of sales directed to be made of the testator's land.

And in the case of *Clay and Craig* vs. *Hart*, (*supra*,) it was decided, that "the obligation imposed by the bond, being altogether legal, the sureties cannot be liable for any other breach than that of the legal duties of the executor embraced by the condition of the bond. So far as creditors were concerned, the sureties were liable only for the faithful administration of legal assets, or '*the goods, chattels and credits*" of the testator. And, therefore, though the proceeds of land, if charged with the payment of debts, constituted equitable assets in the hands of the executor, the sureties were not liable therefor."

*The sureties of an executor not liable to creditors on account of a misapplication of equitable assets: Clay & Craig vs Hart, (7 Dana, 1,) (but see now the act of 1838.)*

The failure, in the executor's bond required by the act of 1797, to impose on the sureties a liability for the faithful performance by the executor, of all powers with which he was invested by the testator, being an obvious defect, an act was passed in 1838, (3 *Stat. Law*, 239,) requiring thereafter, all bonds given by executors to contain a further condition, which embraces the whole duty and powers of an executor. But this latter statute cannot affect the liability of sureties in a bond previously given under the act of 1797.

But although the sureties in this case are not liable for the administration of the equitable assets in the hands of the executor, it is immaterial for the purposes of this suit; because there are legal assets in his hands, for which they are liable, more than adequate to the discharge of the complainant's demand. The balance due on the executor's own note, would be nearly suffi-

cient for this purpose; and it is clearly demonstrated by the testimony in the cause, that when the judgment at law was obtained by the complainants' testator, there were assets to a considerable amount, in the hands of the executor which he afterwards appropriated illegally to the payment of other debts. Apportioning the assets thus illegally appropriated, between the two funds in the executor's hands ratably, agreeably to their respective amounts, the portion which would thus be designated as legal assets, would, in conjunction with the balance due on the executor's own note, be more than sufficient to pay the complainant's demand, without taking into consideration the assets still in his hands unadministered, as reported by the commissioner.

After the death of Alexander Nelson, the complainant, who resides in Virginia, being his executor, and ascertaining that a suit in chancery had been instituted in the State of Virginia, by the assignees of Ninian Menzies, against the trustees of the aforesaid Sampson Matthews, in which suit the demand asserted in this one, was attached as part of the estate of Sampson Matthews, notwithstanding the assignment of it to Alexander Nelson, he made application to that Court to be relieved of the responsibility of managing the claim, and requested the Court to assume its management, and if the debt should be collected, to adjust and settle the rights of the claimants to the money. The Court, thereupon, made an order appointing Leslie Combs, of Kentucky, its commissioner or receiver, with power to prosecute the suit and collect the money.

An objection is now made to the jurisdiction of the Court, and also to the prosecution of the suit in the name of the present complainant, because of the aforesaid order of the Court in Virginia; and that Combs, the commissioner and receiver, is a resident of this State.

An agent, a resident of Ky. may sue in the General Court where a non-resident is the beneficiary, and the suit has to be prosecuted in his name.

This objection, however, is unavailing. The suit has to be prosecuted in the name of the executor of Alexander Nelson, dec'd., to whom the notes were assigned. He being a non-resident, the General Court had jurisdiction. The suit could not have been carried on in the name of Combs, the commissioner. He has no in-

terest in the fund. He occupies the attitude of any other receiver, appointed by a Court of Chancery. And whether the fund, when collected, shall be adjudged to belong to the complainant, or to the estate of Sampson Matthews, is a matter that does not concern the executor of Brooks, or his sureties, and cannot be made to operate on the question of their liability.

Nor can any doubt exist as to the jurisdiction of a Court of Chancery in this case. It is sustainable upon two grounds. First. The settlements made with the executor by the County Court, are attacked on the ground of fraud, which would impart jurisdiction. Secondly. A discovery of assets is sought for, and obtained, which authorized a resort to a Court of equity. And the Court having thus acquired jurisdiction, will retain it for the purpose of affording full and complete relief.

The act of 1819, limiting the time of bringing suits against executors and administrators, is relied upon, as being a bar to this suit in chancery. The action at law against the executor, on the injunction bond executed by his testator, was commenced in the year 1821, before the expiration of five years from the time of his qualification as such, and previous to the making of either settlement with the County Court. Under such circumstances, the statute has no application. If the first suit had not been instituted until after the expiration of five years from the time the executor qualified, and he had before suit brought, distributed the estate according to law, and settled his accounts with the County Court, he might have relied upon these facts by way of defence, in this suit for a *devastavit*, although he had omitted to make such defence in the first suit against him, as was intimated by this Court in the case of *Commonwealth, for Halley's adm'r.* vs *Richardson et al*, (*ante* 86,) But even then, the statute would only operate as a protection to the executor, if he had distributed the estate according to law. So far as the estate remained in his hand unaccounted for, he would still be liable. The object of the statute, was to permit an executor, after the lapse of five years, having paid all the debts of which he was apprized, to pay the residue of the estate in his

SPEED'S EX'R. *vs* NELSON'S EX'R. &c.

Where the object is to assail and surcharge the settlement of an executor with the County Court or discovery of assets, the Chancellor has jurisdiction.

Where a suit at law is brought and judgment recovered against an executor before the lapse of five years after qualification, the act of 1819 affords no relief—nor will it afford relief where a fund remains in his hands undisposed of, though the five years may have elapsed, otherwise if it had been distributed 5 years before suit brought: (8 *Dana*, 186.)

SPEED'S EX'R.
vs
NELSON'S EX'R.
&C.

hand, to the distributees, who thereupon became respon‐ sible to the creditors, and to them he had to look for the payment of his debt, instead of looking to the executor. But it would be a perversion of the object and design of the statute, to permit it to operate as a shield to an executor, who still retained the estate in his hands un‐ disposed of. Nor would his situation be improved, by a fraudulent settlement with the County Court, show‐ ing a full administration of the estate, when in reality a large portion of it remained in his hands, unapplied to the payment of debts, and not received by the distribu‐ tees. The statute received substantially the same con‐ struction in the case of *McLaughlin's adm'rs.* vs *Dan‐ iel,* (8 *Dana,* 186.)

But it is contended, this is a stale demand, and should not obtain the countenance or favor of the Chancellor. This objection seems to be founded on a misconception of the history of this controversy. The creditor pursu‐ ed his demand with unremitting vigilance, until the year 1830. He brought his suit at law in apt and reasona‐ ble time. Having obtained a judgment, he issued exe‐ cution after execution against the executor, until the period above mentioned. He died shortly afterwards, and the present complainant, his executor, commenced this suit in the year 1839. The delay from 1830 until 1839, was probably occasioned by the death of the creditor. When, however, it is recollected that the payment of this debt, although urged with zeal, and at‐ tempted to be enforced by legal means, has been defeat‐ ed by the fraudulent conduct of the executor, in misap‐ plying one portion of the assets in his hands and con‐ cealing another, an omission for a period of nine years, to use further efforts for its collection, should not be re‐ garded as negligence of such a character as to bring upon the complainant's claim the disfavor of the Chancellor, or the condemnatory appellation of a stale demand.

The Court below pronounced a decree in favor of the complainant, for the amount of his debt against the ex‐ ecutor personally, and also against James Speed, as ex‐ ecutor of John Speed, deceased, one of the executor's sureties, out of the assets in his hands.

The decree of the Circuit Court a‐ gainst executor and sureties.

Speed's ex'r.
vs
Nelson's ex'r.
&c.

When the executor qualified, he executed a bond with Ambrose Camp, John Speed and Squire Brooks as his sureties. Camp removed from the State and died insolvent; no administration was ever granted on his estate and his heirs are proceeded against as unknown. Speed and Brooks, the other sureties, are both dead; the personal representative of each is, however, before the Court.

Several objections are made to the decree, supposing it to be right that a decree should have been rendered in favor of the complainant.

It is insisted the Court below should have enforced the lien on the land purchased by the executor, for the residue of the purchase money due by him, before it rendered any decree against the surety. But it does not appear that there is any existing lien upon the land. If there be any which a creditor of the testator could enforce, which would be very questionable under any circumstances, the surety, if he be compelled to pay the debt, can have the benefit of it, by substitution, for his indemnity. The creditor having a right to proceed directly against the executor and his sureties, is not bound to pursue any collateral remedies to secure the payment of his demand. He may do so if he choose, but as it might have a tendency to delay the collection of his debt, he may omit to avail himself of this right, and take a personal decree against the parties. For the same reason he is not required to pursue equitable assets, and have them applied to the payment of his demand, before he would have a right to require payment to be made by the surety; if any such assets exist, which does not certainly appear to be the fact in this case.

The decree, as rendered, is also objected to, because it is not against the administrator of Brooks, the other surety in the bond. This we think a valid objection. The failure to include him in the decree, is certainly to the prejudice of Speed's executor. He has a right to his assistance in discharging the amount decreed to the complainant. For this purpose he should be embraced by the decree. No reason exists for his exemption from its operation. Should the executor of Speed be com-

pelled to pay the amount of the decree, or any part of it, and seek contribution against the administrator of the co-security, he might be met with the answer, that the decree had the effect of discharging him from all liability; and whether such would be its effect or not, he has a right to require that it shall include his co-defendant, that he may have his aid in discharging a joint responsibility.

The defendant in this Court has assigned as error, the failure of the Court below to set aside a sale and purchase made by himself, under his execution, of a part of the land devised by Joseph Brooks for the payment of his debts, on the ground that the land was not subject to sale under execution, and that the amount of his demand has been diminished by the credits entered on the execution by the officer, at the time of the sale. He did not, however, in the pleadings, ask the Court for relief on this point, nor present it for adjudication, and has, therefore, no right to complain that it was unnoticed by the Court.

The error in not making the decree embrace the administrator of Squire Brooks, is not to the prejudice of the executor of Joseph Brooks, the principal in the bond, and on the writ of error prosecuted by him, the decree is affirmed. But on the writ of error prosecuted by Speed's executor, it is reversed, and cause remanded with directions to enter a joint decree against him and the administrator of the other surety, and Neil, the executor, to be made first out of the estate of the latter, and then of the assets in the hands of Speed's executor and Squire Brooks' administrator.

*Pirtle & Speed and Robertson* for Speed's executor; *Robinson & Johnson* for Nelson's executor.